In the matter of the last will and testament of ANNIE EATLEY, deceased, late of Middlesex county.

[Submitted November 20th, 1913. Decided December 27th, 1913.]

1. Evidence on the probate of a will *held* to show that the will was properly executed; that the testatrix was competent to make it, and that she executed it with full knowledge of its contents and with an appreciation of its legal effect.

2. Evidence, in a proceeding for the probate of a will. *held* insufficient to show that its execution was procured by undue influence.

3. The relation between testatrix, a widow of about fifty years of age, suffering from a fatal illness, and her sister, the beneficiary, with whom she lived, testatrix being free to visit other relatives, some of whom were at enmity with the beneficiary, who nursed and ministered to her, was *not a confidential relation such as would, with other slight circumstances, create a presumption of undue influence.*

4. Where testatrix's sister, with whom she made her home, nursed and cared for her during her illness, while her daughter, who was married and resided across the continent, though affectionate, was lax, if not indifferent, about writing, the testatrix's will leaving her property, consisting of a house and lot, to the sister was not an inofficious testament.

5. A will cannot be held invalid simply because it seems unjust, though that would be a formidable circumstance in showing its invalidity for some other reason.

6. That testatrix's sister, who was made the sole beneficiary, did not telegraph testatrix's daughter of her death until the next day, and said nothing about the will, which was not offered for probate for nearly two months, was not sufficient to cast the burden of proof as to undue influence on the beneficiary.

7. Where the existence of a confidential relation between the testatrix and beneficiary with other circumstances raises a presumption of undue influence, the denial of the beneficiary, if otherwise credible and not challenged by other facts, is sufficient to overcome the presumption.

8. Influence upon a testatrix arising from kindness, love and affectionate devotion do not constitute undue influence, nor are they evidence of undue influence, or even a suspicious circumstance, in the absence of positive proof.

9. The burden of proving undue influence upon a testatrix rests upon those asserting it, and mere influence, with opportunity and motive to exert it, will not suffice, but it must appear directly, or by justifiable inference, that the influence was exerted and operated to dominate the testatrix and cause her to make a will she would not otherwise have made.

10. Under *3 Comp. Stat. 1910 p. 3885 § 197,* authorizing the court to order the payment of the costs of an unsuccessful contest against the probate of a will out of the estate, if the contestant had reasonable cause for contest, where an order admitting a will to probate was reversed on appeal to the orphans court, the allowance by that court of the contestant's counsel fees and costs will be affirmed upon reversal of the judgment of the orphans court, as the judgment of the orphans court showed that the contestant had reasonable cause for the contest.

On appeal from the orphans court of Middlesex county.

*Mr. Walter C. Sedam* and *Mr. Freeman Woodbridge,* for the appellants.

*Mr. George S. Silzer,* for the respondents.

BACKES, VICE-ORDINARY.

The will of Annie Eatley, deceased, was admitted to probate by the surrogate of Middlesex county, and letters testamentary were granted by him. On appeal to the orphans court the order of the surrogate was reversed and probate denied because, as recited in the order (no opinion was filed), the paper-writing offered for probate was not duly executed; that the deceased was not competent to execute the same, and that it was not the last will and testament of the deceased. From the reversing order this appeal is taken. The undisputed facts in the case are these: Annie Eatley lived in Metuchen, New Jersey, until the death of her husband in December, 1911. She was then in delicate health, suffering from diabetes, which illness had reduced her weight from two hundred and fifty pounds to one hundred and twenty-one pounds. From that time on, until her death, she made her home with her brother and sister, Albert A. Miller and Mame Stephens, at Wilkesbarre, Pennsylvania. Although ill in body, she was apparently sound in mind until shortly before her death, which occurred on the morning of May 8th, 1912. She was in her normal condition of health until about eleven o'clock in the morning of May 7th, when she took to her bed. The attending physician was then called; her brothers and sisters were hastily summoned, and a lawyer was sent for, who drew her will, in which the sister Mame Stephens was made the sole beneficiary and executrix. The deceased left surviving her a daughter, Eva Pittack, her father, two sisters and five brothers. The estate consisted of $100 in cash and a house and lot at Metuchen.

1. The execution of the instrument was attended with all of the solemnity required by our statute concerning wills. The attestation clause certifies that it was signed by the testatrix in the presence of the two subscribing witnesses, who in her and in each other's presence subscribed their names. It is deficient as to publication, but this was supplied by the witnesses at the trial. That the paper-writing contains the wishes of the deceased as expressed by her at the time it was executed, and that she consciously gave voice to them, is sustained by an overwhelming preponderance of the evidence. This seems to have

been the immediate situation: A Mr. McLaughlin, a member of the Wilkesbarre bar, and an attorney of good standing—this is conceded—drew the will. He had been sent for by a brother of the deceased at her request. From her alone he obtained his instructions and without suggestion from him. These were reduced to writing, and after the document was read to the testatrix, and approved and signed by her, it was at her request attested by Mr. McLaughlin and Albert A. Miller. This, in substance, is sustained by the attesting witnesses, who are disinterested, and by the beneficiary, and who also affirm that the testatrix was rational and entirely sensible of the transaction. It is combated by a brother, John P. Miller, who was unfriendly towards the beneficiary and hostile at the trial. He was at the bedside of his sister fanning her when the attorney, the beneficiary and the brother-witness entered the room. He testified that the deceased was practically unconscious all during the time the four were present; that she did not recognize him; that she wandered in her talk; that her eyes were closed and that she uttered only affirmative monosyllables in reply to questions put to her by Mr. McLaughlin. He denied that the testatrix gave directions as to her will; he says she was so prostrated that she could not and did not know what she was doing, and insinuates that the will was fabricated by the counsel and by him forced upon the deceased. This testimony, it is said, and it may have, carried weight with the learned trial judge, but it does not impress me as a true narrative of the occurrence, when analyzed in the light of the witness's own conduct at that time. He admits he knew Mr. McLaughlin to be a local practitioner and one, as he says, of good repute in the community. He was not unmindful of the purpose of the lawyer's presence. He heard the will read to his dying sister and observed that she indicated she understood it and expressed her satisfaction by saying "Yes" when asked whether it was drawn according to her notion. He even helped to prop her up so that she could more comfortably execute the will. He says he fully comprehended its object and realized that a grievous fraud was being practiced upon the deceased and a great wrong being perpetrated upon her daughter, and submitted without a single mur-

mur of disapproval or the slightest protest from him. He attempts to explain his actions by the fact that he was at loggerheads with the beneficiary and the brother-witness, and the fear that any interference would only add to the bitterness of feeling then existing. I cannot believe that an honest man would supinely witness such an infamous outrage as this witness portrays and much less that he would actively participate, because of the reasons he assigns. The motive is entirely out of harmony with human impulses and the worth of his testimony of the event is correspondingly affected. And in searching for the truth, we may ask: Of what interest could it have been to the lawyer that Mrs. Stephens should be made the sole beneficiary, and that he should conspire in her behalf? He was merely an acquaintance of the Miller family. He was called in simply as a scrivener, to put a testament into legal form. He had no other concern, and it is inconceivable that a gentleman of his professional standing would gratuitously lend himself to so shocking and unconscionable a scheme as this one is said to have been, and to attempt its accomplishment under circumstances which inevitably must lead to discovery and disgrace.

Two other and disinterested witnesses were called, who gave testimony as to the condition of the mind of the testatrix on the day she made her will. Mrs. Butz says she called upon her between eleven and twelve o'clock in the forenoon. This was before the will was drawn. She held intelligent conversation with the testatrix. Nellie Hand, a nurse, called about four forty-five in the afternoon, after the will was executed, and stayed some time with the deceased. She took her respiration and pulse; the latter she found very strong. Her testimony indicates that the deceased at that time was mentally alert.

The evidence satisfies me that the paper-writing offered for probate was executed as wills are required to be; that the testatrix was competent to make the will; that she had full knowledge of its contents; that it was fairly read and explained to her, and that she executed it understandingly and with an appreciation of its legal effect.

It was pointed out in the argument, as of significance, that the attorney inserted the name of the beneficiary as the execu-

trix of the will without consulting the deceased. It need only be commented that the beneficiary was the logical representative to be named, and that her appointment was approved by the testatrix after the will was read to her. Attention was also directed to a statement alleged to have been made by Mr. Mc-Laughlin immediately after the will was executed, to the effect that he did not know whether the paper would stand a legal test. John P. Miller, who asserts that it was made, is contradicted by the other three witnesses present. But, if made, does it signify anything more than that a lawyer unfamiliar with the laws of this state, expressed his apprehension that the instrument might be faulty because it may not have been executed with the formalties required by our statute concerning wills? Some criticism was also made of the course pursued by the attorney in disposing of the deceased's personal estate. At the time he called to draw the will, he was told by the testatrix that her possessions consisted of the house and lot in New Jersey and $100 in cash in a bank in Wilkesbarre, all of which she desired should go to her sister. He thereupon drew and had executed an assignment of this money and delivered it with the bank book to Mrs. Stephens. His explanation is that he did this to avoid taking out letters in Lucerne county, Pennsylvania, obviously, because the amount involved was small. This was prudent and manifestly advisable.

2. The next question is, is the will the product of undue influence? There is not a scintilla of evidence showing that anybody approached, or in the least measure persuaded the deceased to make a will. The first suggestion came from the deceased when she asked her sister to send for a lawyer, and then repeated this request to her brother. The contention is that the testatrix was under the complete domination of the beneficiary; that the will is inofficious, and that the conduct of the beneficiary after the will was executed reflects a fraudulent procurement, from all of which the law presumes undue influence and puts upon the beneficiary the burden of showing affirmatively that when the testatrix made her will she did not exercise her power over the testatrix to her own advantage, and to the disadvantage of others having an equal or superior claim upon the

bounty of the testatrix.    *Carroll* v. *Hause, 48 N. J. Eq. (3 Dick.) 269.*

Mrs. Eatley was about fifty years of age, widowed, alone and fatally ill, when she sought a home with her brother and the sister, the beneficiary, who lived together as one household.   In this she became and was treated as a welcome member.   Her physical condition naturally invited the kindly ministrations of her sister, who sometimes nursed her, helped her to dress and with her toilet; accompanied her while visiting and wrote her letters.   Her friends called upon her and she mingled with them at her pleasure.   She was on intimate terms and visited the families of her brothers and sister, who were at enmity with the beneficiary.   Her's was a free agency to go and come as fancy led.   These circumstances do not establish a confidential relation such as is illustrated in the opinions in *Sparks Case, 63 N. J. Eq. (18 Dick.) 242,* and *In re Cooper's Will, 75 N. J. Eq. (5 Buch.) 177,* which, with "other slight circumstances," casts upon the proponent the burden of showing that the will was untrammeled by undue influence.   This is not seriously controverted, but it is urged that because of the dependency in those of her affairs to which I have just alluded, it ought to be assumed that when the deceased was nearing dissolution, the beneficiary took advantage of her helplessness to wring from her this testamentary disposition.   This is entirely too visionary for thoughtful submission by counsel or consideration by the court. Nothing in the intercourse between the beneficiary and the deceased offers the slightest ground for such speculation and conjecture.   Furthermore, this fact stands boldly in refutation: When it was surmised that death was approaching, the family differences were laid aside and the brothers were sent for, and in the presence of one of them, who was especially antagonistic, the will was executed.   Now, is it likely, is it reasonable that if the beneficiary had importuned and cajoled the deceased for self-gain, as we are asked to believe she did, she would have summoned them to perhaps bear witness to her infamy?   Frauds of this character are usually conducted hiddenly, and it is incredible that one who had had abundant opportunity to contrive in secret, should so audaciously flirt with probable exposure or as brazenly challenge detection.

It is said that the will was an unnatural one.   The property in Metuchen, it was said on the argument, came to the deceased from her second husband by survivorship, under an estate by the entirety.   Mrs. Eatley's daughter, by her first husband, was married and resided with her family in Seattle, where she went some eleven years ago.   Correspondence between the two was infrequent, and while it is true that their relations were at all times affectionate, it is also quite plain from the evidence that the daughter was lax, if not indifferent, in her letter communications and in her solicitude for her mother's welfare.   This we have from her letter written after her mother's death.   In her condition of loneliness and sickness, the deceased turned to her sister, the beneficiary, for solace and comfort.   She had intended, if her health improved sufficiently to stand the trip, to eventually make her home with her daughter, which, however, never came to pass.   While it may be so that the deceased made expressions of intended testamental disposition in favor of her daughter, yet we must not lose sight of the impressions of sincere appreciation which were undoubtedly made upon her mind by the faithful care and attention which were unstintingly given by the beneficiary at a time when the deceased was most in need of them, and that in grateful recognition and partly as compensation they may have, and justly, furnished the motive for the selection of the sister instead of the daughter as the proper object of the deceased's bounty.   The situation at least modifies the claim put forth by the daughter as the exclusive natural object of her mother's bounty, and qualifies the other that the will was one which the testatrix could not make consistent with the claims of duty or affection.   It takes the will out of the class called "inofficious testaments" and militates against the contention that it was not the spontaneous act of the deceased.   We are not at liberty to destroy wills simply because they strike us as unjust.   That is only a formidable circumstance in the consideration of the cause.   "The power of disposition belongs equally to the good and to the bad, and wills cannot be set aside merely because unequal or unjust.   If capacity, formal execution, and volition appear, the will of the most impious man must stand, unless there is something, not in the motives which led to the disposition, but in the actual disposition, against good morals

or against public policy. It may be harsh and severe, it may be extremely cruel under some circumstances, to disinherit one child and to bestow the whole estate upon another, but if the testator be of disposing mind and memory, and duly execute such will in the forms prescribed by law, no court can interfere." *Trumbull* v. *Gibbons, 22 N. J. Law (2 Zab.) 117* (on *p. 153*) ; *Middleditch* v. *Williams, 45 N. J. Eq. (18 Stew.) 726; Kitchell* v. *Beach, 35 N. J. Eq. (8 Stew.) 446; Turner* v. *Cheesman, 15 N. J. Eq. (2 McCart.) 243; Bennett* v. *Bennett, 50 N. J. Eq. (5 Dick.) 439.*

It is claimed that the beneficiary suppressed the will, and it is argued that this supplies the "other slight circumstance" (presupposing that a confidential relation has been established) to cast upon the proponent the obligation of overcoming the presumption of undue influence. The record discloses nothing but absolutely normal conduct on the part of the beneficiary until after the death of the testatrix. Then Mrs. Stephens failed to telegraph to the daughter informing her of her mother's death, until the day following, and later on, in a letter to the daughter, did not mention the will, and the will itself was not offered for probate until nearly two months after it was made.

Mr. McLaughlin, the attorney, took possession of the will after it was executed. It was a matter of common knowledge in the Miller family that the will had been made. There was no effort made to conceal it from them, and it is a fair presumption that they knew its contents. John P. Miller, the unfriendly brother, did, and it is not at all unlikely that he discussed it with the other members of the family. The explanation of the beneficiary on cross-examination, as to why she did not promptly communicate the death to the daughter, and why she withheld information as to the execution of the will, is not as frank and satisfactory as the circumstances permitted and as she could have given. She pleaded distress and commotion in the household as a reason for not immediately notifying the daughter that her mother had passed away, and says in response to repeated prodding of the cross-examiner, that "she did not know" why she did not inform her of the will. The witness was apparently laboring under great excitement occasioned by a vigorous and

searching cross-examination, and evidently took refuge in "I don't know," as so many witnesses do, to escape the ordeal, rather than to submit herself to further torture by giving a rational explanation, which in this case obviously is that she refrained from communicating and frankly unbosoming the truth, through a spirit of reluctance to reveal unpleasant news, which would only bring sorrow and mortification to the daughter. Her conduct, unwise and disingenuous as it was, does not to my mind evince a guilty conscience of constraint upon the testamentary mind of the deceased. The making of the will was not concealed, in the sense used by the authorities, which as a "slight circumstance" shifts the burden of proof.

But if I should accept, as it is argued, that the circumstances, unfavorable to the beneficiary, taken in the concrete, make a case which raises the presumption of undue influence, it will not affect the result. The beneficiary, and her brother, with whom the deceased lived, and who were her intimate associates, both emphatically deny that they influenced the testatrix. The denial of the beneficiary, standing alone, if otherwise credible, and not challenged by other facts, is sufficient to overcome the legal presumption. *Sparks Case, supra.* We need, however, not stand on this narrow margin. Taking into consideration all of the circumstances of the case surrounding the making of the will, they utterly rout the presumption and convince me that the will was initiated by the deceased and expresses her testamentary design. The only acts of the beneficiary which might be regarded as having influenced the testatrix were those born of kindness and love and affectionate devotion, which at no time and nowhere have been denominated in the law as undue, nor has their recognition in testamentary dispositions ever been held to be evidence of undue influence or even a suspicious circumstance in the absence of positive proof. *Howell* v. *Taylor, 50 N. J. Eq. (5 Dick.) 428; Trumbull* v. *Gibbons, 22 N. J. Law (2 Zab.) 117; In re Gleespin, 26 N. J. Eq. (11 C. E. Gr.) 523.* "The burden of establishing the influence which is 'undue' rests on those who assert it. Mere possession of influence and opportunity, and motive to exert it, will not suffice. It must appear either directly or by justifiable inference from facts proved that

the influence was exerted and operated to dominate testator and coerce him to make a disposition of his property which he would not otherwise have made." *Schuchhardt* v. *Schuchhardt, 62 N. J. Eq. (17 Dick.) 710.* No such proof was essayed.

So much of the decree as reverses the order of the surrogate granting probate and letters testamentary will be reversed.

Appeal was also taken from so much of the decree below as granted counsel fee and costs to the contestant. In view of the court's judgment that the will was invalid, it followed as a necessary sequence that it also found that the contestant had reasonable cause for contest and properly made the allowance. *3 Comp. Stat. p. 3885 § 197.* This feature of the decree is affirmed.